UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| CHAD D. SHREEVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. 1:12-cv-00154-PPS |
| | ) | |
| D.O. McCOMB & SONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

Chad Shreeve alleges that his former employer, funeral home operator D.O. McComb & Sons, Inc., violated the Family and Medical Leave Act when it fired him while on FMLA leave. D.O. McComb says that Shreeve's claim is dead on arrival because it terminated his employment for reasons unrelated to FMLA leave, and the timing was purely coincidental. Because I find that a reasonable jury could be persuaded by Shreeve's circumstantial evidence that his taking FMLA leave was a motivating factor behind his termination, D.O. McComb's motion is denied.

**BACKGROUND**

D.O. McComb operates funeral homes, and Shreeve started working in their embalming room in December 2008. Shreeve held the title of intern. [Docket Entry ("DE") 15 at 2, DE 27 at 5.] It's a curious title, but D.O. McComb does not dispute that Shreeve eligible for FMLA leave, I will assume that it did. So for present purposes, I will assume that Shreeve was entitled to FMLA leave, D.O. McComb granted it, and Shreeve properly took it. It's what occurred while he was on leave that is the subject of this lawsuit.

While he was on leave Shreeve filed a grievance against D.O. McComb alleging harassment, a hostile work environment and "sabotage by means of desecration of a dead human body." (DE 16-9, DE 27 at 6-7.) More specifically, he claimed he felt harassed by coworkers' derogatory comments

about their employer; as an intern, the menial tasks and late-afternoon work all fell to his lot, which was unfair; and coworkers sabotaged a body on which Shreeve was working in order to make Shreeve look bad. The next day Shreeve met with D.O. McComb management and its human resources outside contractor, Julie Thiel of Employer's Administrative Services of Indiana, LLC ("EASi"). After the meeting D.O. McComb had Thiel undertake an investigation. (DE 15 at 4-5.) Thiel reported back to D.O. McComb that her investigation had cleared D.O. McComb employees of the desecration charge.  But in the process of investigating Shreeve's complaints, the matter boomeranged on Shreeve. Suddenly, instead of Shreeve being the complainant, he found himself the target of Thiel's investigation.  (DE 15 at 5, 10-11.)  D.O. McComb claims that this change in course was the result of what Thiel uncovered during her investigation of Shreeve's complaints. But what is curious is the fact that Thiel never contacted Shreeve when the focus of her investigation veered from "Shreeve-as-complainant" to "Shreeve-as-target." (DE 27 at 2.)

In any event, Thiel's memorandum detailing her findings concluded that Shreeve posed a possible threat to the safety of other employees, was insubordinate, and generally did not play well with others or accept constructive criticism, and should therefore be terminated. (DE 16-21.) D.O. McComb sent Shreeve a termination letter in June 2010 – while he was still out on his previously-approved FMLA leave.  The letter explained the reason for termination: D.O. McComb had learned "some very disturbing facts" about Shreeve "including: refusal to perform assigned work; inattention to job duties; and inappropriate and unprofessional comments to management and fellow employees." The letter added that "the most serious finding relates to your admitted past violent acts and continued workplace comments which evidence a violent personal nature." (DE 16-22.)

The parties offered differing accounts of various incidents that occurred during the course of Shreeve's employment, some of which I will address here. Accusations made against each side reach into the realms of the strange, and as far as the macabre and disturbing.

Shreeve apparently wasn't well liked (or even liked for that matter) by his coworkers. He described his working relationships with his colleagues as horrible at the start. (DE 27 at 5.) His duties included mopping, stocking supplies, going to pick up human remains, embalming, restocking caskets, doing laundry and shoveling snow. (DE 16-3 at 2.) Thiel's memo on her investigation findings recounted a number of incidents that employees described to her, although the memo is unhelpfully almost devoid of dates. Shreeve allegedly made references to killing coworkers with a scalpel and beating people with his fists, and told a coworker that God had once stopped Shreeve from murdering someone. He also allegedly got into a loud argument with a coworker, kicked a box that hit her, and used an expletive during the encounter. Generally, coworkers described Shreeve as full of himself – they said he had an inflated sense of self and his own mortuary skills, he thought housekeeping tasks were beneath him, he refused to do things "the McComb way," he worked too slowly, and he couldn't take constructive criticism. (DE 16-12, DE 16-14, DE 16-21.) A coworker characterized Shreeve as fitting the profile of a workplace shooter, and D.O. McComb attached to its memorandum in support of its summary judgment motion a Department of Justice report on workplace violence. (DE 16-14, DE 16-19.) D.O. McComb even made sure to note in its briefing that Shreeve allegedly complained of dental problems because at some point he'd had a habit of brushing his teeth with a *steel wire brush* (strange, indeed, but of dubious relevance). (DE 15 at 8, *emphasis in original*, DE 16-15.)

In essence, D.O. McComb has painted Shreeve as a would-be workplace shooter, a horrible employee and basically a loon. Yet none of the many people (including supervisors) who allegedly

observed Shreeve's disturbing behavior seems to have thought it was worth writing up. (DE 27 at 9, DE 24-1.) It is true that Shreeve received a middling performance review in December 2009 owing mostly to his inability to get along with others. But none of the parade of horribles now recounted were mentioned during the review. (DE 16-17, DE 16-9, DE 16-3 at 3.)

Shreeve disagrees with D.O. McComb's characterizations. He argues that the investigation was a sham, and D.O. McComb was looking for a reason to fire him. He says via affidavit that he never disparaged D.O. McComb, never refused to perform a job duty, never acted violently towards a coworker, never made inappropriate comments, never directed profanity toward a coworker, never went AWOL during work hours, was never counseled regarding the amount of time he took working on a body, and never described himself as superior to his coworkers. Shreeve emphasizes that he was never written up or counseled or given job reviews that reflected the assorted allegations, and his termination letter was the first he heard of these issues. (DE 24-1, which I note that I will construe as the affidavit of Shreeve, because the first enumerated item says that is the affiant's name, and the affidavit purports to be signed by him, although "Nicole Orchard" purports to be swearing to the truth of the affidavit; I will take this as a copy-and-paste error.)

The only incident described in detail by the parties is an incident pertaining to the preparation of the body of Harold Glenn Baker in March or April of 2010, again characterized very differently by Shreeve and D.O. McComb. Baker had been a family friend of Shreeve's, so Shreeve was to work on the body. Various stages of embalming were done improperly (each side blames the other) and Baker's face ended up looking discolored. Shreeve and another employee allegedly then had a sort of unsanctioned, morbid Syfy Channel *Face Off* contest, putting on and taking off makeup in turns in the wee hours of the morning or during a lunch break based on the aesthetic preferences of each employee. Ultimately Baker's family was allegedly unhappy with the high quantity of

makeup that was used. Putting fault aside, and whether this incident provided cause for termination, Shreeve alleges that management knew about the whole affair in plenty of time to use it as cause to fire him *before* his FMLA leave, if it was, in fact, some part of the reason. (DE 15 at 9-10, DE 16-16, DE 16-21 at 1-2, DE 24-1 at 5, DE 27 at 4-5.)

## ANALYSIS

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, I must construe all facts and draw all reasonable inferences from the record in the light most favorable to the nonmoving party. *Id.* at 255.

To be eligible for FMLA protection at all, an employee must have been employed (1) for at least 12 months by the employer from whom leave is requested, and (2) for at least 1,250 hours of service with that employer during the 12-month period preceding the commencement of the requested leave. *Pirant v. U.S. Postal Serv.*, 542 F.3d 202, 206 (7th Cir. 2008); 29 U.S.C. § 2611(2); 29 C.F.R. § 825.110(a). Here, D.O. McComb admits in its answer that Shreeve was lawfully afforded leave time, so eligibility for FMLA protection is not at issue.

An employee can make two different kinds of claims of violation of the FMLA, one for interference with FMLA benefits and the other for retaliation in the form of punitive treatment of an employee who requests FMLA leave. A successful interference claim shows that the employer denied the employee FMLA rights to which the employee was entitled; a retaliation claim requires

a showing of the employer's retaliatory intent. *Shaffer v. AMA*, 662 F.3d 439, 443 (7th Cir. 2011); *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005).[1]

To prevail on an FMLA interference claim, a plaintiff must establish that: "(1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." *Goelzer v. Sheboygan Cty.*, 604 F.3d 987, 993 (7th Cir. 2010) (citation omitted). Both parties agree that Shreeve has established the first four prongs of the interference test; they dispute whether D.O. McComb denied Shreeve a benefit to which he was entitled by terminating his employment before he returned from leave.

D.O. McComb has the better of the argument because Shreeve has no legitimate interference claim. Shreeve can only satisfy the fifth prong in one of two ways. His first option is to claim that by being fired while on FMLA leave, he was denied the FMLA benefit of being reinstated. Reinstatement is one of the classic rights guaranteed by the FMLA, but it is a right only available to *employees* – and once Shreeve was fired, he was no longer an employee and no longer had a right to reinstatement. This is, in fact, exactly one of the situations referenced in the Department of Labor's regulations interpreting the FMLA: "If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave, maintain group health plan benefits and *restore the employee cease at the time the employee is laid off*, provided the employer has no continuing obligations under a collective bargaining agreement or otherwise." 29 C.F.R. § 825.216(a)(1) (*emphasis* added). Seventh Circuit precedent confirms

---

[1] Shreeve voluntarily abandoned his claim of retaliatory discharge under state law in his response to summary judgment. (DE 27 at 15.) So that claim will be dismissed without further discussion.

the point: D.O. McComb "had no obligation to reinstate [plaintiff] because an employer's responsibility to continue FMLA leave and restore an employee 'cease at the time the employee is laid off,' 29 C.F.R. § 825.216(a)(1)." *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1157 (7th Cir. 1997). Of course, an employer can't fire an employee because he is going to take or has taken FMLA leave – but that's a *retaliation* claim, not an *interference* claim.

The only other alternative for Shreeve to shoehorn an interference claim into the facts of this case is to argue that by being fired while on FMLA leave, he was denied a right to remain employed while on his FMLA leave. But in that scenario "the FMLA benefit to which he was entitled" would have to be some sort of right to continual employment while on leave – and the FMLA guarantees no such right. The FMLA does give an employee the right not to be fired simply because he took FMLA leave – but, again, that's a retaliation claim.

Under these circumstances, I agree with other courts that Shreeve's claim is really "only a retaliation claim masquerading" as an interference claim. *Dressler v. Cmty. Serv. Commc'ns, Inc.*, 275 F. Supp. 2d 17, 24 (D. Me. 2003) ("[Plaintiff's] argument that he was 'not restored' because he was taking intermittent leave is really an argument that an adverse employment action (layoff) was imposed on him because he was taking leave. This argument is, inherently, a retaliation argument."); *see also Mascioli v. Arby's Rest. Grp., Inc.*, 610 F. Supp. 2d 419, 432-33 (W.D. Pa. 2009) (same).

That brings me to Shreeve's FMLA retaliation claim. An employee claiming FMLA retaliation may make his case under the familiar direct or indirect methods of proof developed in other employment retaliation contexts. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). To prevail under the direct method, Shreeve must offer evidence that D.O. McComb intended to punish him for exercising his FMLA rights. He can do this directly (by showing D.O. McComb has essentially admitted its wrongful intent) or circumstantially (by showing a "convincing mosaic"

of evidence that allows the jury to infer intentional discrimination). *Cole v. Ill.*, 562 F.3d 812, 815 (7th Cir. 2009); *Buie*, 366 F.3d at 503 (citations omitted).  Under the indirect method, Shreeve must demonstrate that he was treated adversely after exercising his FMLA rights despite doing his job satisfactorily, and similarly situated employees who did not exercise their rights were not treated adversely. *Buie*, 366 F.3d at 503-04.

Generally speaking, the direct and indirect methods of proof are the manner in which employment discrimination cases have been handled for decades. But recently, this familiar paradigm has been called into question by the Seventh Circuit.  The inflexibility of the direct and indirect methods of proof has been criticized. *See, e.g.*, *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737 (7th Cir. 2013);  *Perez v. Thorntons, Inc.*, No. 12-3669, Slip Op. at 8 (7th Cir. Sept. 30, 2013); *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring).  These courts have proposed a more straightforward approach to employment cases by asking the following simple questions: is the plaintiff in a class protected by the statute; has he suffered a harm; and could a rational jury find the latter resulted from the former. *Hitchcock*, 718 F.3d at 737 (7th Cir. 2013) (citing *Coleman*, 667 F.3d at 863 (7th Cir. 2012) (Wood, J., concurring)). In any event, no matter which approach a court takes, a plaintiff in an FMLA retaliation case need only show that retaliation was *a* reason for the action taken by the employer; it need not be the only reason.  *Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 741-42, (7th Cir. 2008).

Shreeve takes issue with many of the specific incidents that D.O. McComb cites as grounds for termination. Of course, at this point in the case, I must view the evidence in the light most favorable to Shreeve, the non-moving party, and I cannot weigh credibility. In any event, how each of these events went down – or whether they happened at all – is irrelevant to my reasoning in deciding this motion. I have included D.O. McComb's factual allegations in this opinion not for their

8

truth, but because they are the grounds offered as a basis for termination. What is relevant is the vehemence of the allegations leveled against Shreeve, and the fact that they don't appear, based on the current record, to have any temporal connection to Shreeve's termination. Which leads me to the following question: if D.O. McComb had such compelling reasons to terminate Shreeve, even assuming for the sake of argument that they are all true, why didn't it do so before he took FMLA leave? The timing is therefore suspicious. And unlike cases that D.O. McComb cites in its briefing, D.O. McComb did not learn of previously unknown or hidden behavior by Shreeve, nor does it allege that Shreeve committed any new fireable offenses while he was on leave. *Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747 (7th Cir. 2009); *Vance v. Ball State Univ.*, 2012 WL 29148 (S.D. Ind. Jan. 5, 2012).

D.O. McComb's briefing presents its extensive investigation into Shreeve's work performance, which D.O. McComb claims resulted in an honest belief that Shreeve's termination was warranted. D.O. McComb further explains that the investigation happened when it did because it stemmed from Shreeve's filing of a grievance against D.O. McComb, not because Shreeve happened to be on FMLA leave. And a jury may well believe that account. If the jury believes D.O. McComb's allegations, D.O. McComb had ample reason to fire Shreeve, and did so for those reasons alone. But there is one simple reason why I cannot find at this point that Shreeve *would have been* fired regardless of his FMLA leave; and that is because he *wasn't* fired before taking FMLA leave. He wasn't fired before, despite allegations of the existence of perfectly good reasons to send him packing that were documented and likely known to management well before the leave.

As I noted above, it isn't clear from the evidence in the record exactly when many of the incidents involving Shreeve took place, but it seems apparent that they did not all suddenly happen right before he took FMLA leave and was fired. At the very least his in-person evaluation took place

in December 2009, his written evaluation existed then, and it noted his general interpersonal issues and specific problems with a coworker in the prep room. Furthermore, D.O. McComb's Motion for Summary Judgment attaches at least seven affidavits detailing Shreeve's unsuitability, not merely claiming he didn't fit in or was unpleasant or wasn't good at his job. Those types of complaints might not make it up the ladder to upper management. But alleged threats that he would murder his colleagues? That is a horse of a different color, and it doesn't seem like the kind of thing employees would keep to themselves, or that management would overlook, and it doubtless provides grounds for termination of employment – so if it happened, why didn't D.O. McComb terminate Shreeve well before he took FMLA leave?

I recognize that suspicious timing alone is generally not enough to get a plaintiff past summary judgment. *Cole v. Ill.*, 562 F.3d 812, 816 (7th Cir. 2009). But I am not relying on timing alone; it is the combination of the termination during FMLA leave and the extremely grave and fireable offenses alleged against Shreeve that management likely would have known about well before it actually fired him. But in all events, timing is an issue of fact and context, not law, and when it's a close call a jury should decide what inferences are appropriate. *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). This is because a fishy reason may logically support the inference that the reason is a veil for retaliation. *Id.*

In sum, if D.O. McComb knew all about Shreeve's alleged workplace behavior before April 2010 – and a reasonable jury could conclude that it did, given the gravity of the issues – and the only thing that changed between April 2010, when Shreeve went on leave, and June 2010, when he was fired, was the intervening FMLA leave, then a reasonable jury could conclude that retaliation played some part in the decision to terminate him.

## CONCLUSION

Defendant D.O. McComb's Motion for Summary Judgment (Docket Entry 14) is denied. This matter is now set for a telephonic status on Wednesday, October 30, 2013 at 1:30 p.m. The purpose of the status conference will be to discuss setting the case for a final pretrial conference and trial. **SO ORDERED.**

ENTERED: October 21, 2013

/s/ Philip P. Simon
**PHILIP P. SIMON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**